<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

_____

GLOBESPANVIRATA, INC.,

               Plaintiff,

               v.

TEXAS INSTRUMENT, INC., THE LELAND
STANFORD JUNIOR UNIVERSITY and
its BOARD OF TRUSTEES, and STANFORD
UNIVERSITY OTL, LLC,

               Defendants.

_____

:
:
:
:
:
:
:
:
:
:

Civ. No. 03-2854 (GEB)

**OPINION**

<u>**BROWN, District Judge**</u>

      This matter comes before the Court upon Defendants Texas Instruments, Inc., The Leland Stanford Junior University and its Board of Trustees, and Stanford University OTL, LLC's (collectively "Defendants") motion to dismiss, with prejudice, Counts III, V, VI and VII, and the *per se* tying claims in Counts I and II, in plaintiff Globespanvirata, Inc.'s ("Plaintiff") Second Amended Complaint ("SAC"). The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will grant Defendants' motion in its entirety.

## I.      BACKGROUND

      Plaintiff is a corporation in the business of providing integrated circuits, software and system designs for Digital Subscriber Line ("DSL") applications. (SAC ¶9.) Plaintiff alleges that Defendants own numerous patents related to Asymmetric Digital Subscriber Line ("ADSL") technology, which technology enables high-speed telecommunication services to be provided over ordinary telephone lines. (*Id.* ¶2.) Included among those patents are ones that are necessary for manufacturing products that comply with certain national and international ADSL standards.

(*Id.*)  According to Plaintiff, only standards-compliant ADSL products are commercially viable. (*Id.*)

On June 12, 2003, Plaintiff brought suit against Defendants for their alleged antitrust violations in various ADSL-related markets.  Plaintiff filed its First Amended Complaint ("FAC") on July 6, 2004.  On July 30, 2004, Defendants filed their Answer to the FAC and asserted counterclaims against Plaintiff for its alleged patent infringement.

On June 24, 2005, Defendants moved to dismiss Counts III, V, VI and VII of the FAC. On September 12, 2005, the Court granted Defendants' motion and allowed Plaintiff to amend the FAC with respect to the dismissed counts.  On September 26, 2005, Plaintiff filed the SAC.

On October 11, 2005, Defendants moved to dismiss Counts III, V, VI and VII, as well as the *per se* tying claims in Counts I and II, of the SAC.  In Counts I and II, Plaintiff alleges that Defendants violated Section 1 of the Sherman Act through conduct that was unlawful both *per se* and under the "rule of reason."  (SAC ¶¶101, 105, 115, 122.)  With respect to the *per se* tying claims in Counts I and II, Plaintiff alleges that Defendants unlawfully agreed to pool and/or tie patents for ADSL Standards Technology with those for ADSL Non-Standards Technology.  (*Id.* ¶¶101-16, 122-28.)

In addition, Plaintiff alleges in Counts III, V, VI and VII that Defendants violated Section 2 of the Sherman Act based on their alleged monopolization, conspiracy to monopolize and/or attempts to monopolize various ADSL-related markets.  Specifically:  (1) Count III alleges that Defendants monopolized or conspired to monopolize the market for ADSL Non-Standards Technology; (2) Count V alleges that Defendants monopolized or conspired to monopolize the market for ADSL Technology; (3) Count VI alleges that Defendants attempted to monopolize the market for ADSL Technology; and (4) Count VII alleges that Defendants attempted to or conspired to monopolize the market for ADSL Systems.  Each of these counts are based on allegations that Defendants used their alleged monopoly power with respect to ADSL Standards Technology to establish monopoly power in the relevant markets.  (SAC ¶¶131-33, 146-48, 153-

2

55, 160-62.)

In managing this case, the Court bifurcated Plaintiff's antitrust claims and Defendants' patent infringement counterclaims, staying the antitrust phase of the litigation until the infringement claims were resolved.  Trial of the patent infringement counterclaims began on January 4, 2006.  On February 6, 2006, the jury returned a verdict in favor of Defendants with respect to their counterclaims.  Having resolved the patent infringement portion of this case, the Court will now address Defendants' motion to dismiss.

## II.    DISCUSSION

### A.    Standard of Review for Motions to Dismiss

In considering a Rule 12(b)(6) motion to dismiss, this Court "must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to plaintiff." *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.), *cert. denied*, 474 U.S. 935 (1985).  *See also Langford v. City of Atl. City*, 235 F.3d 845, 847 (3d Cir. 2000); *Oran v. Stafford*, 226 F.3d 275, 279 (3d Cir. 2000); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).  The Court may dismiss a complaint only if the plaintiff can prove no set of facts that would entitle him to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 604 (3d Cir. 1998); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994); *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990).

With respect to antitrust claims, "[f]acts must be pleaded with reasonable particularity . . . in order to permit an inference that a Federal antitrust claim is cognizable."  *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 328 (D.N.J. 1999).  "It is not . . . proper to assume that [a plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged."  *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).  The trial court has "the

3

power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 528 n.17.

### B.    Plaintiff's Allegations of Monopoly Power for Counts III, V, VI and VII

Defendants argue that Counts III, V, VI and VII of the SAC should be dismissed because Plaintiff has failed to allege specific facts showing that Defendants had monopoly power, or a dangerous probability of achieving it, in the relevant markets.  In particular, they point to Plaintiff's failure to allege Defendants' share of those markets.  For purposes of this motion, the relevant markets are the markets for:  (1) ADSL Non-Standards Technology (Count III); (2) ADSL Technology (Counts V and VI); and (3) ADSL Systems (Count VII).

In response, Plaintiff argues that market share is only one method by which it may prove that Defendants possess monopoly power, and that its allegations support a claim that Defendants possessed such power.  Specifically, Plaintiff has alleged that for each of the disputed counts, Defendants had monopoly power, or a dangerous probability of achieving it, as a result of their alleged control of ADSL Standards Technology.   (Pl.'s Opp. Br. at 5 ("[t]he starting point for Defendants' monopoly power in all of the relevant markets is their ownership of patents alleged to be essential for compliance with the ADSL Standards and their resulting monopoly power in the ADSL Standards-Compliant Technology market").)  The Court will consider whether the facts alleged in the SAC are sufficient to state a claim with respect to each of the disputed counts.

### 1.    Requirements for Section 2 Claims

Plaintiff claims that Defendants violated Section 2 of the Sherman Act by monopolizing, conspiring to monopolize and/or attempting to monopolize various markets for ADSL technology and products.  To state a claim pursuant to Section 2, a plaintiff must allege that the defendant enjoys monopoly power in the relevant market.  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  For a claim of either attempted monopolization or conspiracy to

monopolize, a plaintiff must allege that the defendant has a dangerous probability of achieving monopoly power. *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) (citing *Schuylkill Energy Res. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 413 (3d Cir. 1997)); *Urdinaran v. Aarons*, 115 F. Supp. 2d 484, 491 (D.N.J. 2000). To adequately state its claims, then, Plaintiff must allege facts showing that Defendants either have monopoly power or a dangerous probability of achieving it with respect to the relevant markets.

### a.    Proof of a Defendant's Monopoly Power

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "[T]he size of market share is a primary determinant of whether monopoly power exists . . . ." *Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania*, 745 F.2d 248, 260 (3d Cir. 1984). *See also Gordon v. Lewistown Hosp.*, 423 F.3d 184, 211-12 (3d Cir. 2005) ("Once the markets are defined, we must determine whether [the defendant]'s market share is sufficient to infer the existence of market power"). Other factors are also relevant in considering whether a defendant has monopoly power. "A predominant share of the market, or a lesser market share combined with other relevant factors, may suffice to demonstrate monopoly power." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir. 1992). *See also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[a] less than predominant share of the market combined with other relevant factors may suffice to demonstrate monopoly power"). Such factors include: the size and strength of competing firms; freedom of entry into the field; pricing trends and practices in the industry; the ability of consumers to substitute comparable goods or services from outside the market; and consumer demand. *Fineman*, 980 F.2d at 202. *See also Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 209 (3d Cir. 1994).

5

**b.      Proof of a Dangerous Probability of Achieving Monopoly
Power**

As with proving a defendant's monopoly power, a defendant's market share is the

"[m]ost significant" factor in proving a dangerous probability of achieving monopoly power.

*Pastore v. Bell Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994).  But similarly,

"although the size of a defendant's market share is a significant determinant of whether a

defendant has a dangerous probability of successfully monopolizing the relevant market, it is not

exclusive."  *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992).  "[F]actors to be

reviewed 'include the strength of the competition, probable development of the industry, the

barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer

demand.'"  *Pastore*, 24 F.3d at 513 (quoting *Barr Labs.*, 978 F.2d at 112).


**2.      Plaintiff Has Failed to State a Claim With Respect to Counts III, V,
VI and VII**

The Court finds that Plaintiff has failed to state a claim with respect to Counts III, V, VI

and VII.  Allegations concerning a defendant's share of the relevant market are highly significant,

and Plaintiff has failed to make such allegations for each of the disputed counts.  While other

factors are also relevant, they are typically considered alongside facts concerning market share,

not in lieu of such facts.  Although Plaintiff cites a number of cases acknowledging the relevance

of factors other than market share, in none of those cases did the court find that the plaintiff

sufficiently stated a claim in the absence of allegations concerning market share.  *See Allen-*

*Myland*, 33 F.3d at 201-09 (discussing the defendant's market share in determining whether it

had monopoly power); *Barr Labs.*, 978 F.2d at 112-13 (discussing the defendant's market share

in determining whether it had a dangerous probability of achieving monopoly power); *Brunson*

*Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 569-73 (E.D. Pa. 2002) (dismissing

plaintiff's Section 2 claim for failure to allege sufficient facts showing defendant's monopoly

power); *World Arrow Tourism Enters., Ltd. v. Trans World Airlines*, 582 F. Supp. 808, 811-12

6

(S.D.N.Y. 1984) (same).

Plaintiff argues that allegations concerning market share are inappropriate in this case because "technology markets . . . are not readily susceptible to market share calculations in the same manner applicable to markets for traditional goods . . . ." (Pl.'s Opp. Br. at 15.)  Plaintiff, however, has not even attempted to make such calculations, difficult or qualified though such calculations may be.  Nor has Plaintiff provided support for its assertion that the technology market is not susceptible to such calculations.

Moreover, to the extent that a plaintiff could in theory prove monopoly power without alleging market share, Plaintiff fails to state a claim in the disputed counts because it fails to adequately allege facts even with respect to the other relevant factors.  *See Fineman*, 980 F.2d at 202.  The Court will discuss Plaintiff's failure with respect to each of the relevant markets.

### a.      Market for ADSL Non-Standards Technology (Count III)

Plaintiff defines the ADSL Non-Standards Technology market as the market for "features of ADSL Systems that are not essential for compliance with the ADSL Standards but provide functions and capabilities that enhance the efficiency, value, attractiveness or operability of such systems." (SAC ¶90.)  According to the SAC, "Defendants' requirement that licensees of their ADSL Standards-compliant Technology also purchase a license to [D]efendants' ADSL non-Standards Technology forecloses the majority, if not all, of the potential competition for the licensing of ADSL non-Standards Technology . . . ." (SAC ¶133.)

Plaintiff fails to allege facts showing Defendants have monopoly power in the ADSL Non-Standards Technology market.  Instead, it focuses on Defendants' alleged conduct. According to the SAC, Defendants have monopoly power in the market for ADSL Standards Technology and required licensees of that technology to also license ADSL Non-Standards Technology.  (SAC ¶¶131-33.)  There are no factual allegations, however, concerning the degree of control enjoyed by Defendants in the ADSL Non-Standards Technology market as a result of

7

their alleged conduct.

In particular, Plaintiff has not alleged Defendants' market share, a significant factor in establishing monopoly power.  Nor has Plaintiff adequately alleged facts concerning other relevant factors, including:  the size and strength of firms competing in the ADSL Non-Standards Technology market; the pricing trends and practices in that market; the ability of licensees to substitute Defendants' ADSL Non-Standards Technology with other technology; and the nature of licensees' demand for such technology.  *See Fineman*, 980 F.2d at 202.  Although Plaintiff has alleged that Defendants' ownership of ADSL Standards Technology serves as a barrier to entry for competitors in the ADSL Non-Standards Technology market, it does so in a conclusory manner – the allegations do not indicate the extent to which Defendants' alleged conduct may have impeded competition.  (*See* SAC ¶132-33.)  Thus, even assuming the truth of Plaintiff's allegations concerning Defendants' conduct, Plaintiff has not alleged facts showing that Defendants had monopoly power, or a dangerous probability of achieving it, with respect to the ADSL Non-Standards Technology market.

### b.      Market for ADSL Technology (Counts V and VI)

Counts V and VI concern the market for ADSL Technology as a whole, which technology consists of both ADSL Standards Technology and ADSL Non-Standards Technology.  (*See* SAC ¶91 ("[a] broader relevant market for ADSL Technology as a whole also exists, which includes both the market for ADSL Standards-compliant Technology and the market for ADSL non-Standards Technology").)  Again, Plaintiff's claim here rests on its allegations that Defendants exclusively owned the patents for ADSL Standards Technology.  Specifically, Plaintiff alleges that "Defendants were able to obtain monopoly power in the ADSL Technology market because any actual or potential licensee of ADSL Technology invariably will require a license to [D]efendants' ADSL Standards-compliant Technology."  (SAC ¶148.)

Plaintiff has failed to allege sufficient facts concerning Defendants' monopoly power in

the ADSL Technology market.  As with Count III, Plaintiff's claims in Counts V and VI are based on allegations concerning Defendants' conduct.  Plaintiff fails to allege any facts showing Defendants' market share in the ADSL Technology market.  It has also failed to allege facts describing the characteristics of the competitors, customers and pricing practices of that market. Although Plaintiff alleges that Defendants' conduct resulted in barriers to entry for potential competitors, it has done so in a conclusory manner.  (*See* SAC ¶¶147-48, 154-55.)  Plaintiff has therefore failed to allege sufficient facts showing that Defendants had monopoly power, or a dangerous probability of achieving it, in the ADSL Technology market.

### c.    Market for ADSL Systems (Count VII)

Count VII concerns the market for ADSL Systems.  Plaintiff alleges that "access to [D]efendants' technology is a prerequisite to entering the market for ADSL Systems," and that by controlling "an essential input for the production of ADSL Systems[,]" Defendants have "the power to exclude new entrants and/or raise the costs of competing producers . . . ."  (SAC ¶162.)

Plaintiff fails to allege sufficient facts to state its claim.  As with the previous counts, Plaintiff's claim is based on Defendants' alleged monopoly power in the ADSL Standards Technology market.  (*See* SAC ¶¶ 161-62.)  Plaintiff does not, however, allege specific facts concerning Defendants' monopoly power in the ADSL Systems market.  For example, it has not alleged facts showing the extent to which Defendants control the market for ADSL Systems relative to other competitors, whether by market share or otherwise.  Nor has it, for example, alleged the degree to which Defendants' conduct has excluded competitors or raised the prices for ADSL Systems for consumers of such systems.  Its allegations that Defendants' conduct created barriers to entry for competitors are, again, conclusory.  (*See* SAC ¶161-62.)

Taken as true, Plaintiff's allegations show that Defendants had an advantage in the ADSL Systems market as a result of their ownership of patents for ADSL Standards Technology.  They do not show, however, that Defendants have monopoly power, or a dangerous probability of

achieving it, in the ADSL Systems market.  Plaintiff has therefore failed to state a claim with respect to Count VII.

**C.     Plaintiff's *Per Se* Tying Claim in Counts I and II**

Defendants also seek dismissal of the Plaintiff's *per se* tying claims in Counts I and II of the SAC.  Both counts are based on Section 1 of the Sherman Act.  Count I alleges unlawful conspiracy in restraint of trade, and Count II alleges unlawful tying.  For both counts, Plaintiff claims that Defendants' alleged conduct was unlawful both *per se* and under the "rule of reason." (SAC ¶¶ 101, 105, 115, 122.)  For the reasons below, the Court finds that the *per se* tying claims in Counts I and II should be dismissed.

**1.     Certain Tying Arrangements Constitute *Per Se* Violations of the Sherman Act**

Certain tying arrangements are *per se* unlawful.  "[W]here (1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected, then the defendant's tying practices are automatically illegal without further proof of anticompetitive effect."  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992) (citing *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).  The Supreme Court has stated that "application of the *per se* rule focuses on the probability of anticompetitive consequences."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-16 (1984).  "The character of the restraint produced by [a prohibited *per se* tying arrangement] is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the arrangement may be found."  *Id.* at 9.  *See also Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7-8 (1979) ("certain agreements or practices are so 'plainly anticompetitive,' . . . and so often 'lack . . . any redeeming virtue,' . . . that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases") (citations

omitted).

2.    **The *Per Se* Rule Does Not Apply Where a License for a Patent Necessary to Comply with a Standard Is Tied with Related Non-Essential Licenses**

In *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179 (Fed. Cir. 2005), the Federal Circuit Court of Appeals considered whether the *per se* rule applied in cases where a seller ties a license for technology necessary for practicing a standard with licenses for related nonessential technology.  In that case, Philips appealed a decision by the United States International Trade Commission ("Commission") that a number of Philips's patents were unenforceable because of patent misuse.  *Philips*, 424 F.3d at 1182.  Philips owned the patents for manufacturing recordable compact discs and rewritable compact discs in accordance with certain technical standards.  *Id.*  It offered them through package licenses that also included patents that were nonessential for complying with the standards.  *Id.*  Philips charged a royalty for each disc made using the package license, and the royalty was the same regardless of how many of the licensed patents were used.  *Id.*

After a number of licensees failed to pay royalty fees, Philips filed a complaint against them with the Commission for patent infringement, and the respondents raised patent misuse as an affirmative defense.  *Id.* at 1182-83.  According to the licensees, "Philips had improperly forced them, as a condition of licensing patents that were necessary to manufacture CD-Rs or CD-RWs, to take licenses to other patents that were not necessary to manufacture those products."  *Id.* at 1183.  The administrative law judge found that Philips's patents were unenforceable as a result of patent misuse.  *Id.*  The Commission upheld that decision, finding that "Philips's patent package licensing arrangement constituted *per se* patent misuse because Philips did not give prospective licensees the option of licensing individual patents (presumably for a lower fee) rather than licensing one or more of the patent packages as a whole."  *Id.* at 1184.

The Federal Circuit Court of Appeals held that a patent-to-patent tying arrangement is not

11

*per se* unlawful.  The court based its reasoning on antitrust law for tying arrangements.  It noted that "[t]he [Supreme] Court has made clear that tying arrangements are deemed to be *per se* unlawful only if they constitute 'a naked restrain[t] of trade with no purpose except stifling of competition' and 'always or almost always tend to restrict competition and decrease output' in some substantial portion of a market."  *Id.* at 1185 (quoting *Broad. Music*, 441 U.S. at 19-20).  "The Supreme Court has applied the *per se* rule only when 'experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it . . . .'"  *Id.* (quoting *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 344 (1982)).  "Conduct is not considered *per se* anticompetitive if it has 'redeeming competitive virtues and . . . the search for those values is not almost sure to be in vain.'"  *Id.* (quoting *Broad. Music*, 441 U.S. at 13).

In explaining the inapplicability of the *per se* rule, the court identified a number of pro-competitive effects resulting from the practice of packaging licenses.  License packaging "'may provide procompetitive benefits by integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation . . . [thereby] promoting the dissemination of technology, cross-licensing and pooling arrangements . . . .'"  *Id.* at 1192 (quoting U.S. Department of Justice and Federal Trade Commission, *Antitrust Guidelines for the Licensing of Intellectual Property* § 5.5 (1995)).  It also "reduces transaction costs by eliminating the need for multiple contracts and reducing licensors' administrative and monitoring costs."  *Id.*  License packaging also "allows the parties to price the package based on their estimate of what it is worth to practice a particular technology, which is typically much easier to calculate than determining the marginal benefit provided by a license to each individual patent."  *Id.*

The Court of Appeals distinguished Supreme Court cases in which tying arrangements were deemed to be unlawful *per se*.  Specifically, the court found it significant that Philips's tying arrangement concerned licenses rather than products.  According to the court:

12

> Philips gives its licensees the option of using any of the patents in the package, at the licensee's option.  Philips charges a uniform licensing fee to manufacture discs covered by its patented technology, regardless of which, or how many, of the patents in the package the licensee chooses to use in its manufacturing process.  In particular, Philips's package licenses do not require that licensees actually use the technology covered by any of the patents that the Commission characterized as nonessential.  In that respect, Philips's licensing agreements are different from the agreements at issue in [*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948)], which imposed an obligation on the purchasers of package licenses to exhibit films they did not wish to license.

*Id.* at 1188.  *See also id.* at 1187-89 (distinguishing *U.S. v. Loew's, Inc.*, 371 U.S. 38 (1962)).

The court reasoned that "[a] nonexclusive patent license is simply a promise not to sue for infringement" and "does not obligate the licensee to do anything . . . ."  *Id.* at 1189.  For this reason, the *Philips* case differed from patent-to-product tying cases where "the patent owner uses the market power conferred by the patent to compel customers to purchase a product in a separate market that the customer might otherwise purchase from a competitor."  *Id.* at 1189-90.

> [A] package licensing agreement that includes both essential and nonessential patents does not impose any requirement on the licensee.  It does not bar the licensee from using any alternative technology that may be offered by a competitor of the licensor.  Nor does it foreclose the competitor from licensing his alternative technology; it merely puts the competitor in the same position he would be in if he were competing with unpatented technology.

*Id.* at 1190.  "The package license is thus not anticompetitive in the way that a compelled purchase of a tied product would be."  *Id.*


### 3.    Defendants' Alleged Tying Arrangement Does Not Constitute *Per Se* Violation of the Sherman Act

For the reasons provided in *Philips*, the Court finds that Defendants' alleged tying arrangement does not constitute a *per se* violation of the Sherman Act.  Tying a patent that is necessary for complying with a standard with related but nonessential patents does not constitute "a naked restrain[t] of trade with no purpose except stifling of competition" that "always or almost always tend to restrict competition and decrease output . . . ."  *Broad. Music*, 441 U.S. at 19-20.  The *per se* rule does not apply where a tying arrangement has "redeeming competitive virtues and . . . the search for those values is not almost sure to be in vain."  *Id.* at 13.  The

13

*Philips* court identified a number of potential benefits that may result from such tying arrangements.  *See Philips*, 424 F.3d at 1192-93.

Plaintiff argues that *Philips* does not control this case for a number of reasons.  The Court finds these arguments to be unpersuasive.

First, Plaintiff argues that this case is controlled by Supreme Court and Third Circuit Court of Appeals cases that have explicitly recognized tying arrangements as *per se* unlawful. The Supreme Court and Third Circuit cases to which Plaintiff cites are consistent with *Philips* because they involved the tying of products.  *See Jefferson Parish*, 466 U.S. 2; *Town Sound*, 959 F.2d 468; *Independent Ink v. Illinois Tool Works, Inc.*, 396 F.3d 1342 (Fed. Cir. 2005), *rev'd on other grounds*, __ U.S. __, No. 04-1329 (March 1, 2006).  While certain types of tying arrangements may remain *per se* unlawful, patent-to-patent tying cases do not fall into that category.  The Court is persuaded by the reasoning in *Philips* that the *per se* rule against certain tying arrangements should not extend to patent-to-patent tying cases in light of the pro-competitive aspects of such arrangements.  As the Supreme Court recently stated, "[m]any tying arrangements, even those involving patents and requirements ties, are fully consistent with a free, competitive market."  *Illinois Tool Works*, slip op. at 16 (holding that in cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product). Thus, to the extent that *Philips* is consistent with the *per se* rule against certain types of tying arrangements, and because it directly addresses the issue before this Court, that decision should be followed.

Second, Plaintiff seeks to distinguish *Philips* as a case about patent misuse rather than antitrust violations.  Although *Philips* concerned patent misuse, its reasoning applies to antitrust cases also.  The *Philips* court itself observed that "because of the importance of anticompetitive effects in shaping the defense of patent misuse, the analysis of tying arrangements in the context of patent misuse is closely related to the analysis of tying arrangements in antitrust law."  *Philips*, 424 F.3d at 1185 (citing *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868-69 (Fed.

14

Cir. 1997)).  *See also USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 512 (7th Cir. 1982) (Posner, J.) ("If misuse claims are not tested by conventional antitrust principles, by what principles shall they be tested?  Our law is not rich in alternative concepts of monopolistic abuse; and it is rather late in the day to try to develop one without in the process subjecting the rights of patent holders to debilitating uncertainty.").

Finally, Plaintiff argues that *Philips* should be distinguished because the decision was based on a developed fact record, and Plaintiff has not yet had an opportunity to develop facts to prove its claims.  However, the *Philips* court's discussion of the facts in that case merely provided further support to its more general finding – that "a package licensing agreement that includes both essential and nonessential patents does not . . . bar the licensee from using any alternative technology that may be offered by a competitor of the licensor . . . ."  *Philips*, 424 F.3d at 1190.  Moreover, to the extent that *Philips* was based on facts showing that the licensor had not charged a royalty for the nonessential patents, Plaintiff has not specifically alleged contrary facts in the SAC, *i.e.* that the price for the license package was greater than what Defendants could have charged for licenses of the ADSL-Standards Technology only.  *See id.* at 1191-92 ("[b]ecause a license to the essential patent is, by definition, a prerequisite to practice the technology in question, the patentee can charge whatever maximum amount a willing licensee is able to pay to practice the technology in question.").

III.     CONCLUSION

For the above reasons, Defendants' motion to dismiss is granted.  Specifically, the Court dismisses Counts III, V, VI and VII, as well as the *per se* tying claims in Counts I and II, of the Second Amended Complaint.  An appropriate form of order is filed herewith.

Dated:  March 3, 2006

s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.